# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| OUTSIDE TELEVISION, INC., )<br><br>Plaintiff, )<br>v. )<br>)<br>DREU MURIN )<br>)<br>Defendant. ) | Civil No. 2:13-cv-00185-NT |

## ORDER ON PLAINTIFF'S MOTION
## FOR PRELIMINARY INJUNCTION AND ON
## DEFENDANT'S MOTION TO TRANSFER VENUE

Before the Court is Plaintiff Outside Television, Inc.'s ("**OTV**") motion for preliminary injunction, ECF No. 3, filed on May 17, 2013. OTV claims that Defendant Dreu Murin, a former employee, has breached the non-solicitation and confidential information clauses of his employment agreement and requests an injunction preventing further breaches. Following expedited briefing, the Court on June 4, 2013 held a testimonial hearing. On June 21, 2013, the parties filed closing briefs and the Court took the motion under advisement. Also before the Court is Defendant Dreu Murin's motion pursuant to 28 U.S.C. § 1404(a) to transfer this case to the United States District Court for the Eastern District of California, ECF No. 19. For the reasons that follow, the Court **DENIES** both motions.

## FACTUAL BACKGROUND

The Court makes the following provisional factual findings based on affidavits submitted by the parties and testimony introduced at the June 4, 2013 hearing.

1

OTV produces local paid promotional programming featuring businesses, activities, and events in the area of South Lake Tahoe, California. Lake Tahoe has two tourist seasons, a winter ski season and a lakeside summer season. In the off seasons, Lake Tahoe's population is around 20,000, but tourists can boost the population to 120,000. Depending on the time of year, OTV's programming can draw a viewing audience of anywhere from 1,000 to 10,000 viewers. The content of OTV's programming is driven by its advertisers and includes interviews with local business owners, contests, and editorial segments featuring local businesses. OTV broadcasts in the Lake Tahoe area and also has a local cable channel. OTV's daily live morning show, *Tahoe Today*, is its top-rated show.

In the spring of 2011, Murin began working for OTV as an unpaid intern, a position which blossomed that summer into a full-time position as a producer and on-air talent for the company. When he accepted paid employment at OTV, Murin signed an employment agreement that required him not to disclose OTV's confidential and proprietary information and to refrain from soliciting any of OTV's customers for a period of twelve months from the date of his termination from employment. Exhibit A to Verified Complaint, ECF No. 1-1, (the "**Employment Agreement**").

Murin testified that he signed the agreement after reviewing it briefly and without attempting to negotiate any of its terms. The contract appears on its face to have been drafted by OTV's predecessor as a standard form contract presented to new OTV employees. Paragraph 14 of the contract contains a forum selection clause which provides: "any legal proceeding regarding the interpretation or enforcement

2

of this Agreement shall be instituted in a court of competent jurisdiction located within the State of Maine." *Id*.

From July of 2011 through September 18, 2012, Murin worked for OTV as a producer. Most of his time was spent on location meeting with clients. He executed the advertising contracts sold by the sales team and worked with clients to craft their campaigns. He was responsible for fitting his segments into the schedule and for hosting many of OTV's live broadcasts, including *Tahoe Today*. He also emceed events, which helped reinforce OTV's relationships with its clients. Clients typically liked working with Murin because he has a dynamic personality well-suited to OTV's promotional programming. He had contact with all of OTV's clients, which annually average between 100 and 120, but he was not involved in sales or pricing.

Murin also had access to OTV's playbook, which contained elements for the production of a daily show. The playbook specified that the daily show would open with a montage of visuals, showcase advertising clients in interviews about their businesses, and cover weather, entertainment, and local recreational opportunities. The playbook also discussed "lower-third banners," which are essentially text boxes used to identify the names of interviewees, businesses, and websites that are placed over the lower third of the viewing screen during interview segments.

In the spring of 2012, the parties had a misunderstanding relating to Murin's second job at a local radio station, KTHO (referred to as "K-Tahoe"). KTHO and OTV share a number of clients, including Barton Health, Base Camp Pizza, Specialty Sports Ventures, and Sorenseon's Ski Resorts. Peter Loughlin, OTV's general manager, claims that he was unaware when Murin was hired that he was

also a regular radio DJ host at KTHO. When Loughlin learned about it, he was alarmed and he made it clear to Murin that he did not want Murin working for a competing medium. However, based on Murin's representations that he had only one three-hour show per week and that he was not working with KTHO's clients, OTV decided not to prevent Murin from working there. Murin admitted that he was subject to a "write-up" and that he was given the option of taking a pay cut and continuing to work for KTHO, or dropping KTHO and continuing as a full-time OTV employee. Murin testified that he chose to take the pay cut and to continue working for both OTV and KTHO, but it is unclear whether the proposed pay cut ever took place. In any event, Murin continued to work for OTV after the KTHO situation came to light.

In the summer of 2012, two interns reported to Murin that Loughlin was sexually harassing them. Murin, as the interns' supervisor, relayed their reports to OTV's human resources department in what he thought was a confidential process. On September 18, 2012, at about 6:00 p.m., Murin was called into a meeting at OTV that was already underway. At the meeting were Loughlin, OTV's human resources director Jeffrey Dumais, and two female interns. When Murin entered the room, both interns were distressed and one was in tears. Murin was very upset to find that a meeting had been called in which the interns were brought in front of Loughlin to discuss their accusations against him.

None of the parties have a clear recall of what was said at the meeting, and they disagree about the circumstances under which Murin left the meeting. Loughlin testified that Murin became very upset, accused Dumais of violating

4

confidentiality, apologized to the interns about what was happening to them, and averred that he was there to protect them. Loughlin recalls that Murin left the meeting after having said something to Loughlin and Dumais along the lines of "You're going to have to do this without me. I'm not working here anymore." Loughlin understood that Murin was tendering his resignation at this point, and he testified that this left him scrambling to fill Murin's spot hosting the next morning's show.

Murin agrees that he was very upset about the breach of confidentiality and about the way the interns were being treated, but he denies that he resigned at the September 18 meeting. Murin testified that he stayed at the meeting until it was over. He recalls that at the end of the meeting he asked if he and the interns could be excused and that Dumais responded "yes." Murin testified that he showed up as usual the next morning for work at around 7:00 a.m., only to find another local on-air talent already recording show updates. Murin testified that his replacement told Murin that he had heard Murin was not coming. Murin nevertheless put on a microphone to begin the live portion of show when Loughlin arrived and asked Murin to leave. Murin asked Loughlin if he was being fired. Loughlin again asked Murin to leave, which Murin then did. According to Loughlin, his requests to Murin included an assertion that Loughlin was not firing Murin, but that Murin had given his notice the night before. Murin did not return to work at OTV after the September 19 encounter. Also, both interns resigned from OTV following the September 18 meeting.

Murin testified that his passions are television and radio and that he promotes himself on his web page as an on-air talent. On December 31, 2012, Murin uploaded a highlights reel of his television work onto YouTube, including work he had done for OTV. In January of 2013, OTV became aware of the highlights reel and reported to YouTube that it contained footage owned by OTV, after which it was taken down. Part of the highlights reel contained footage of a show that was shot shortly before the September 18 meeting.

OTV's production director filed an affidavit stating that he became aware "on or about September 17, 2012" that master tapes in which Murin appeared were missing from OTV's archives and that he notified Loughlin of the missing tapes at that time. He concluded that Murin must have taken the master tapes from OTV's archives. OTV, however, did not file a police report or otherwise pursue return of the master tapes from Murin prior to filing suit against Murin on May 17, 2013. Murin denies taking the master tapes. He avers that the master tapes are unusable outside of the studio because they use an "old style" of recording that very few places can access, and that he obtained the footage for his highlights reel off of the web, where OTV posts its programming. He also asserted that, had anyone contacted him about OTV's content on his highlights reel, he would voluntarily have taken it down, but no one ever did.

After his separation from OTV, Murin continued to work for KTHO and became the regular co-host of its morning program. In March of 2013, with the help of some friends, Murin also began taping a daily half-hour video program called *Wake Up Tahoe*. Every day after Murin completes his morning radio show he films

*Wake Up Tahoe*. He then posts the show to YouTube in the afternoon. The program begins with catchy music over a scenic montage of the Tahoe area. The body of the program opens with banter between Murin and his co-host on topics of local interest, and that is usually followed by a guest interview. The guest is typically a local figure of some sort, either an entertainer or a business owner. In the middle of the show, there is a two-minute commercial segment. Both South Tahoe Stand-Up Paddle and Maui Jim sunglasses have filled the commercial segment. The show also features live reports and call-ins from on-location shoots at businesses in the Tahoe area. The program labels guests and provides business names and website url's through means of a lower-third banner.

*Wake Up Tahoe* is taped in the wedding chapel at the MontBleu Resort Casino & Spa on the south shore of Lake Tahoe. MontBleu is an advertising client of OTV. The show promotes itself as taped in front of a "live studio audience," but Murin admitted that the audience is at most a few people on any given day, and that these people are Murin's friends. The anchor desk for the show is made out of what appears to be a paddleboard and is branded with the name "South Tahoe Stand-Up Paddle." It was donated to the show by Chris Brackett, the owner of this business. South Tahoe Stand-Up Paddle was an advertising client of OTV.

In the spring of 2012, South Tahoe Stand-Up Paddle signed a $2,500 advertising contract with OTV but later canceled the contract. The sales associate in charge of this contract averred in an affidavit that Brackett had told her that he heard that there was an employee at the station who had been fired for reporting sexual harassment. OTV claims that Brackett canceled the contract as a result of

these accusations, which Brackett had heard from Murin. Brackett denies that he related any negative statements to OTV as the reason for canceling his contract, and he claims that he canceled the contract because other media provided better returns on his advertising investment.

One *Wake Up Tahoe* episode features an establishing shot[1] of the Heavenly Village ski base area, including a visual of the sign for the Base Camp Pizza restaurant, a client of both OTV and KTHO. In another episode, Murin interviews Steve Bryant of Lake Tahoe Boat Rides. Lake Tahoe Boat Rides was a former OTV client that ceased advertising with OTV in the fall of 2012. Another business that advertised with OTV in 2012, Big Blue Adventure Series, was featured on *Wake Up Tahoe* and, as of the time of the preliminary injunction hearing, had not renewed its advertising contract with OTV. OTV offered affidavits from other OTV clients including On Course Events and Lake Tahoe Golf, averring that Murin had offered them exposure on *Wake Up Tahoe*.[2] The event coordinator for On Course Events stated in her affidavit that, while soliciting On Course Events for advertising on *Wake Up Tahoe*, Murin warned her that OTV's staff had overpromised their yield, reach, and frequency.

OTV's director of outside sales, Mike Peron, testified that in April and May of 2013, additional clients including Lake Tahoe Adventures, ServiceMaster and Lake Tahoe Yoga reduced or eliminated their advertising with OTV. Peron testified that

---

[1]    An establishing shot, which usually begins a new scene, is a wide view shot that establishes for the viewer where the new scene takes place.

[2]    OTV also offered an affidavit from the owner of McP's Pub Tahoe stating that Murin had solicited him in February of 2013 for advertising on *Wake Up Tahoe*. Murin denies this charge.

although he has received no negative feedback about OTV's products and services, clients have told him that Murin had said that employees at OTV were sexually harassed and that OTV was going to be closing its doors because of this. Loughlin admitted, however, that he was unable to say whether OTV's advertising revenues this year are worse than they have been in the past. Murin denies having discouraged anyone from advertising with OTV.

Murin denies receiving any money from MontBleu, South Tahoe Stand-Up Paddle, or any other businesses featured on *Wake Up Tahoe*, although he agrees that he did not pay for the space at MontBleu in which *Wake Up Tahoe* is filmed or for the anchor desk he received from South Tahoe Stand-Up Paddle.

*Wake Up Tahoe* has no broadcast or cable outlet, but is exclusively available online. On average, each daily program receives between 50 and 100 views on YouTube. Neither Murin, nor his co-host, nor the creator of the opening montage, nor their cameraman, who are the only people working on *Wake Up Tahoe*, receive any payment for producing this program.

On March 23, 2013, Murin had confrontations with Peron and Loughlin at a business expo that Murin was emceeing. Prior to the expo, Peron had posted on Murin's Facebook page that Murin's show was a joke and that viewers should go to OTV's programs for the real deal. Murin confronted Peron, asking him why he had posted this message, and Peron reiterated that he thought Murin's show was a joke and that OTV was still going strong without Murin. Peron also mentioned, though, that he had already taken down the Facebook post, and that it was not meant to be personal, and the two men ended up shaking hands.

Murin also testified that, at some other point during the expo, Loughlin stepped in front of Murin, grabbed his arm, and ordered Murin to "stop talking shit" about Loughlin. Murin asked Loughlin what he was talking about, and Loughlin repeated that Murin had been badmouthing him. Murin asserted that the only bad thing he had said about Loughlin was in relation to the Facebook posts about Murin's show. Murin said it was childish to post stuff like that on his Facebook page. At some point in the conversation, Loughlin allegedly said he was going to pound Murin into the ground if Murin did not knock it off, and, as the two argued back and forth, the confrontation drew a crowd. After a few minutes, however, they cooled off and Murin went back to his duties at the expo.

Following the confrontation with Loughlin at the expo, Murin's California attorney Eugene Chittock, Esq. sent a cease and desist letter to Loughlin, Peron, and Jeremy DeMarzo, who was then OTV's production manager. The letter demanded that the recipients cease posting "mendacious and misleading" comments and remove all prior comments regarding Murin from Facebook. It further demanded that Loughlin cease "violent acts" against Murin, referring to Loughlin's confrontation with Murin at the expo. The letter gave its recipients until April 10, 2013 to respond, and it threatened suit thereafter. On April 11, 2013, an attorney representing OTV requested a two-week extension to respond to Attorney Chittock's letter.

OTV did not respond to Attorney Chittock's letter, but instead filed suit against Murin in this court on May 17, 2013. On the same day, Murin filed suit in the El Dorado County, California Superior Court against OTV alleging hostile work

environment, defamation, trade libel, negligent and intentional infliction of emotional distress, and retaliation and failure to prevent harassment and discrimination in violation of California's Fair Employment and Housing Act.

## I. Motion for Preliminary Injunction

A preliminary injunction "'is traditionally viewed as relief of an extraordinary nature and does not purport to be a disposition of the matter on its merits.'" *Francisco Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009) (quoting *United States v. School Dist. of Omaha,* 367 F. Supp. 179, 193 (D. Neb. 1973)). The purpose of a preliminary injunction "'is not to determine any controverted right, but to prevent a threatened wrong or any further perpetration of injury . . . [,] and thus to protect property or rights . . . until the issues can be determined after a full hearing.'" *Francisco Sanchez*, 572 F.3d at 14 (*quoting Benson Hotel Corp. v. Woods,* 168 F.2d 694, 696 (8th Cir. 1948) (alterations in original)). In determining whether to grant a preliminary injunction, the Court considers the following factors:

> first, the likelihood that the party requesting the injunction will succeed on the merits; second, the potential for irreparable harm if the injunction is denied; third, the hardship to the non-movant if enjoined compared to the hardship to the movant if injunctive relief is denied; and fourth, the effect of the court's ruling on the public interest.

*Water Keeper Alliance v. U.S. Dept. of Defense,* 271 F.3d 21, 30 (1st Cir. 2001).

## A. Likelihood of Success on the Merits

"'The sine qua non of [the preliminary injunction inquiry] is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.'" *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012) (quoting *New Comm Wireless Servs., Inc. v. SprintCom, Inc.,* 287 F.3d 1, 9 (1st Cir. 2002)). "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." *Id.* (quoting *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 21 (2008)).

OTV claims that Murin's position provided him with access to OTV's clients and goodwill and that the restrictions in the employment agreement permissibly protect that goodwill and those client relationships. In particular, OTV seeks to enjoin Murin from:

1. contacting, soliciting, competing for, or engaging in competitive solicitation of any customer of Outside TV or any person or entity that Defendant has, during the twelve (12) months immediately preceding his termination, solicited or serviced on behalf of Outside TV or that has been so solicited or serviced, during such period, by any person under Murin's supervision;

2. further contacting or soliciting any customer of Outside TV or any person or entity that Defendant has contacted or solicited in violation of the Employment Agreement since the termination of his employment with Outside TV; and

3. directly or indirectly divulging, revealing, reporting, publishing, transferring or disclosing, for any purpose whatsoever, any confidential information which has been obtained by or disclosed to Defendant as a result of his employment with Outside TV, including, without limitation, any Proprietary Information, as that

term is defined by the Employment Agreement, without written authorization from Plaintiff.

Def's Mot. for Preliminary Injunction 14-15 (ECF No. 3).[3] To prove a likelihood of success on the merits, OTV must establish a strong likelihood both that the restrictions in the employment agreement are enforceable and that Murin breached these restrictions. There are two kinds of restrictions in the employment agreement at issue in this case: (1) the non-solicitation/non-compete clause and (2) the clauses relating to protection of confidential or proprietary information. The Court reviews each one in turn.

### 1. The Non-Solicitation/Non-Compete Clause

The pertinent part of Paragraph 7 of the Employment Agreement provides:

The Employee . . . agrees that for a period of twelve (12) months from the date of termination of his employment, he will not, on behalf of himself or any person or entity of the Company, (i) compete for, or engage in competitive solicitation of, any customer of the Company, or any person or entity that he has, during the twelve (12) months immediately preceding such termination, solicited or serviced on behalf of the Company or that has been so solicited or serviced, during such period, by any person under the Employee's supervision . . . .

---

[3]    OTV also asks the Court to order the Defendant (1) to remove from the internet, including YouTube, any trade secret, confidential, or proprietary information belonging to OTV, and (2) to return to OTV any trade secret, confidential, or proprietary information which he has in his possession, including but not limited to the master tapes and any copies of the contents thereof. Def's Mot. for Preliminary Injunction 14-15 (ECF No. 3). As to the first request, it appeared as of the time of the hearing on the preliminary injunction that the Defendant's highlights reel, which was the subject of this request, was removed from YouTube, mooting this issue. OTV did not press this request in its closing brief. As to the second request, the parties do not dispute that OTV is entitled to possession of its master tapes. The Defendant simply denies having taken them. The Court declines to enter an order requiring the Defendant to return the master tapes to OTV for two reasons. First, OTV presented little beyond speculation to demonstrate that the Defendant actually took the tapes. Second, though OTV was aware that the tapes were missing for eight months prior to filing this lawsuit, it took no action during that time to attempt to recover them. This suggests that the relief requested is not necessary to prevent any threatened wrong or further perpetration of injury against OTV. *See Francisco Sanchez v. Esso*, 572 F.3d at 14. Any order requiring return of the tapes can await a definitive factual finding that the Defendant actually took them.

The Court applies Maine law based on the agreement's choice-of-law provision. Employment Agreement ¶ 14. Maine considers non-competition covenants generally to be contrary to public policy. *Chapman & Drake v. Harrington,* 545 A.2d 645, 647 (Me. 1988). Such covenants "will be enforced only to the extent that they are reasonable and sweep no wider than necessary to protect the business interests in issue." *Id.* The reasonableness of a non-compete covenant is determined both by looking at how broadly it sweeps with respect to duration and geographic area and also by assessing the interests the covenant seeks to protect. *Id.*

Murin asserts that the Court should find the non-solicitation clause in his contract unreasonable and thus unenforceable because Maine has declared broadcasting industry contracts presumptively unreasonable. *See* 26 M.R.S.A. § 599. Murin's contract with OTV falls within the statutory definition of a broadcasting industry contract. *See Id.* at § 599(1) (defining broadcasting industry contract as "an employment contract between a person and a legal entity that owns one or more television stations or networks or one or more radio stations or networks"). And Maine specifically disapproves of certain non-compete terms in broadcasting industry contracts:

> A broadcasting industry contract provision that requires an employee or prospective employee to refrain from obtaining employment in a specified geographic area for a specified period of time following expiration of the contract or upon termination of employment without fault of the employee is presumed to be unreasonable.

26 M.R.S.A. § 599(2). Thus, the statute now protects the ability of all broadcast industry employees—from on-air talent to producers to sales representatives[4]—to obtain employment without restriction following the expiration or termination without fault of their contracts. However, in order for this presumption to apply, (i) Murin must have been terminated from his employment without fault and (ii) the contract provision must require Murin to refrain from obtaining employment in a specified geographic area for a specified period of time following Murin's termination.

### i.   Whether Murin's Employment Was Terminated Without His Fault

The parties disagree about how and why Murin's employment was terminated. Murin claims he was fired in retaliation for his support of fellow employees' complaints of sexual harassment, and OTV claims Murin resigned.

At the hearing on the motion for preliminary injunction, the Court was essentially presented with a he-said, he-said recounting of the events determining this issue. Although there were several witnesses to the September 18, 2012 meeting and the September 19, 2012 encounter at the station, the Court heard only the testimony of Murin and Loughlin. Neither of these accounts is implausible on its face, and the Court is loath to make even a preliminary determination of fact as to which side's account was more believable, given the centrality of this issue not only to the claims in this suit but also to Murin's claims against OTV in the California

---

[4]     When 26 M.R.S.A. § 599 was first adopted in 1999, it excluded sales representatives from its protections. In 2003, this exclusion was stricken from the statute. *See* 2003 Me. Legis. Serv. Ch. 225 (West).

suit. Since the evidence is in equipoise, OTV has failed its burden of demonstrating a likelihood that Murin resigned. Accordingly, Maine's statutory presumption of unenforceability may apply.

        *ii.    Whether the Provision Requires Murin to Refrain from Obtaining Employment In the Broadcasting Industry*

The non-solicitation clause has the effect of restricting Murin from obtaining other employment in the South Lake Tahoe broadcasting industry. In a market as small as South Lake Tahoe, an on-air talent in the broadcasting industry would be required, as Murin was with OTV, to wear additional hats. As a practical matter, Murin could not obtain other employment in the area without engaging in "competitive solicitation" of at least some of the businesses solicited by OTV. Indeed, OTV argues that the non-solicitation clause should prevent Murin from dealing with any KTHO clients that were also OTV's clients, and that it should prevent Murin from soliciting even unpaid sponsorships from OTV's clients for his web program.

OTV's clients consist of between 100 and 120 local businesses. While the parties presented no evidence regarding what portion of South Lake Tahoe's advertising market share this represents, the evidence regarding the overlap in clientele between OTV and KTHO makes it clear that it would be impossible for Murin to avoid OTV's clients while working at KTHO. Murin's inability to participate in these relationships would fundamentally undermine his ability to maintain his employment at KTHO and to continue producing *Wake Up Tahoe*. The non-solicitation clause is thus a clause that, as a practical matter, "requires an

employee . . . to refrain from obtaining employment in a specified geographic area for a specified period of time" and is presumed unreasonable under 26 M.R.S.A. § 599(2).

No circumstances were presented at the preliminary injunction hearing that might overcome the presumption. Because OTV has not established a strong likelihood that it will prevail in establishing the enforceability of its non-solicitation/non-compete provision, the Court need not address whether, therefore, it is likely that Murin breached this provision.

### 2. The Confidential/Proprietary Information Clauses

OTV also claims that Murin violated the employment agreement's prohibitions against disclosure of confidential and proprietary information. The agreement defines confidential business information to include "price lists, customer lists and data bases, business plans, sales projections and product development plans" and requires employees who are exposed to this information to agree not to "at any time during or following the term of his employment with the Company, directly or indirectly divulge, reveal, report, publish, transfer or disclose, for any purpose whatsoever, any of such confidential information. . . ." Employment Agreement ¶ 4, *see also* Employment Agreement ¶ 3 (further defining categories of "proprietary information" including "Research; Marketing and Customer Information; Business Information; and Other"). Murin has not advanced any particular argument against the enforceability of these restrictions, so the Court considers that they are likely enforceable.

OTV claims that Murin has disclosed three categories of information in violation of the employment agreement: (i) its customer data and prospect lists, (ii) its playbook specifications, and (iii) its program episodes. OTV also claims Murin has misappropriated its customer data and prospect lists in violation of Maine's Uniform Trade Secrets Act, 10 M.R.S.A. § 1542.

### i. *Customer Data and Prospect Lists*

OTV's primary claim that Murin breached the employment agreement's restrictions against confidential and proprietary information centers on Murin's alleged use of OTV's customer data and prospect lists. Factually, this claim is very weak. OTV presented no evidence that it maintains a prospect list or that the information on any such list was not generally known to others engaged in similar business or activities. *See* Employment Agreement ¶¶ 3.1 and 3.4, and 10 M.R.S.A. § 1542 (defining a "trade secret" as "information . . . that: Derives independent economic value . . . from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use . . .").

OTV undoubtedly has marketing and customer information that could be considered confidential or proprietary under the contract, or a trade secret by statute, but it has not demonstrated that Murin misappropriated or disclosed any such information. It has not shown that Murin provided KTHO with any customer contact lists, or that Murin used any such lists for his own ends in the production of *Wake Up Tahoe*. The fact that KTHO, *Wake Up Tahoe*, and OTV all have several clients or "sponsors" in common proves nothing more than that all three are in the

business of providing advertising exposure to businesses in the South Lake Tahoe area. With regard to pricing, OTV has not shown that Murin had access to its client contracts or that he was made aware of the prices of OTV's advertising products and services, much less that he disclosed this information to KTHO or used this information to price advertising contracts for *Wake Up Tahoe*. OTV has not demonstrated a likelihood of success on the merits of this claim.

### ii. *Playbook Specifications*

OTV presented evidence that it uses a playbook that sets forth specifications for its programming and Murin acknowledges that he has seen the playbook. The playbook itself was not offered into evidence. Rather, Loughlin generally described its contents and testified that Murin uses elements that are set forth within it for the creation of *Wake Up Tahoe*. These elements include branding the show with an opening montage of visuals and theme music, using lower-third banners to identify guests and provide contact information, employing "throws" to on-location shoots and including establishing shots of the locations, interviewing guests who talk about their businesses or shows, and covering weather, entertainment, and recreational opportunities.

These are all basic elements of any number of television shows, which are apparent on the face of the shows. They can readily be noted and employed by anyone with the right equipment and technical know-how. As Murin testified, *Wake Up Tahoe* is more a paean to *Kathy Lee & Hoda* than an imitation of *Tahoe Today*. Loughlin did not testify that the playbook provides technical specifications that would be necessary to, for example, implement a "throw" or place a lower-third

banner across the screen. Rather, his testimony was that the playbook simply sets forth that such elements were to be employed and the order in which they were employed. The playbook's contents as described by Loughlin are unlikely to be found either confidential or proprietary.

### iii. Program Episodes

OTV claims that Murin impermissibly used clips from its program episodes, which it claims are its confidential, proprietary information. Murin did use OTV clips in his highlights reel, and posted the reel to YouTube. But as discussed in footnote 2 above, Murin's highlights reel was then removed from YouTube. OTV does not press this issue in its post-hearing briefs. Because there is no longer any apparent alleged harm to be prevented, this issue as moot. *See County Motors, Inc. v. General Motors Corp.*, 278 F.3d 40, 43 (1st Cir. 2002) (holding that when circumstances change so that "'the intended harm-preventing function'" of a preliminary injunction can no longer be served, the controversy "'must be dismissed as moot.'" (quoting *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.,* 48 F.3d 618, 621 (1st Cir. 1995)).

### B. Irreparable Harm

OTV also bears the burden of demonstrating that a denial of interim injunctive relief would cause OTV irreparable harm. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996). OTV provided evidence of only one client, South Tahoe Stand Up Paddle,[5] that ceased advertising with OTV and that

---

[5]     Notably, MontBleu Resort, Casino & Spa, where Murin tapes *Wake Up Tahoe*, is still an OTV client.

thereafter began advertising on *Wake Up Tahoe*. But South Tahoe Stand Up Paddle, which had only advertised with OTV for a couple of years, explained that it made a business decision to cancel its $2,500 2013 OTV contract based on what it perceived as a low return on its investment in advertising through OTV. The Court finds it difficult to credit that South Tahoe Stand Up Paddle in fact stopped advertising with OTV because it felt that *Wake Up Tahoe* would provide it with the exposure it had been looking to get through OTV. OTV's viewership is anywhere from ten to 100 times the size of *Wake Up Tahoe*'s viewership, and the media outlets—cable and broadcast television versus the internet—are different.

More generally, Loughlin admitted that he was unable to say whether OTV's advertising revenues for 2013 were any worse than in previous years. In sum, OTV has been unable to point to any harm at all arising out of Murin's activities, much less irreparable harm.

### A. Balancing the Equities

The disputed circumstances of Murin's separation from employment make it impossible to assign an equitable advantage to either side.

### C. Public Interest

Finally, OTV bears the burden of demonstrating that there is "a fit (or lack of friction) between the injunction and the public interest." *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003) (citing *McGuire v. Reilly*, 260 F.3d 36, 42 (1st Cir. 2001)). The public interest in this case is codified in Maine's statute respecting broadcasting industry contracts. *See* 26 M.R.S.A. § 599. Provided that the employment of a broadcasting industry employee is terminated without the

employee's fault, Maine favors protecting the employee's freedom to engage in further employment without restriction. Because OTV has not demonstrated that Murin resigned, it has failed to demonstrate a fit between the relief it requests and the public's interest in protecting Murin's ability to obtain other employment within the Tahoe area.

## II.    Motion for Change of Venue

Murin moves to transfer this case to the United States District Court for the Eastern District of California where he has pending a lawsuit against OTV asserting various causes of action stemming from his termination from OTV. Section 1404(a) allows federal courts "[f]or the convenience of parties and witnesses, [and] in the interest of justice" to transfer civil actions "to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). Section 1404(a) gives the district court discretion to transfer a case based on "convenience and fairness." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988). Considerations in 1404(a) decisions can include: 1) the convenience of the parties; 2) convenience of the witnesses; 3) the plaintiff's forum preference;[6] 4) where the claim arose; 5) the location of evidence; 6) judicial economy; 7) the local interest of the home forum; 8) the relative congestion of the courts; 9) the first-filed rule;[7] and 10) the parties' contractual agreements. *See Dinan v. Alpha Networks, Inc.,* 803 F. Supp. 2d 71, 74-76 (D. Me. 2011) (citing 15

---

[6]    There is a "strong presumption in favor of the plaintiff's choice of forum." *Coady v. Ashcraft & Gerel*, 223 F.3d 1, 11 (1st Cir. 2000).

[7]    "'Where identical actions are proceeding concurrently in two federal courts . . . the first filed action is generally preferred in a choice-of-venue decision.'" *Coady*, 223 F.3d at 11 (quoting *Cianbro Corp. v. Curran–Lavoie, Inc.,* 814 F.2d 7, 11 (1st Cir.1987)).

Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3847 (2007 ed.)).

Although a forum selection clause is only one factor to consider in the 1404(a) analysis, it is "a significant factor that figures centrally in the district court's calculus." *Stewart v. Ricoh*, 487 U.S. at 29; *Astro-Med, Inc. v. Nihon Kohden America, Inc.,* 591 F.3d 1, 12 (1st Cir. 2009).[8]

> [T]he burden is upon the party resisting the forum-selection clause to "show that enforcement [of the clause] would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching."

*Royal Bed*, 906 F.2d at 49 (quoting *The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 16 (1972)); *see also Huffington v. T.C. Group, LLC*, 637 F.3d 18, 23 (1st Cir. 2011). Inconvenience alone is an insufficient reason to hold a forum-selection clause unenforceable, especially where the inconvenience was "known or contemplated by the parties at the time of their agreement." *Royal Bed,* 906 F.2d at 49; *see also In re Mercurio*, 402 F.3d 62, 66 (1st Cir. 2005).

The Court begins with the strong presumption in favor of OTV's choice of forum and the forum selection clause. Murin bears the heavy burden of establishing that the forum selection clause should not be enforced. The evidence at the hearing

---

[8]     Federal law governs Murin's motion for transfer of venue, including whether to give effect to the parties' forum-selection clause. *Stewart v. Ricoh*, 487 U.S. at 32; *Royal Bed and Spring Co., Inc. v. Famossul Industria e Comercio de Movies LTDA*, 906 F.2d 45, 51 (1st Cir. 1990); *but see Lambert v. Kysar*, 983 F.2d 1110, 1116 n.10 (1st Cir. 1993). Federal courts have not yet reconciled the oddity that, where a party has moved to transfer venue under § 1404, the test for transfer and whether to give effect to the parties' forum-selection clause is a purely federal one, *see Stewart v. Ricoh*, 487 U.S. at 32, but if a party moves to dismiss a claim pursuant to Fed. R. Civ. P. 12(b)(6) alleging improper venue based on a forum selection clause, the enforceability of the forum-selection clause is governed by state contract law. *See Kysar*, 983 F.2d 1110 at 116; *see also Rivera v. Centro Medico de Turabo, Inc.* 575 F.3d 10, 16 (1st Cir. 2009) (discussing "unsettled issue" of whether forum selection clauses are to be treated as substantive or procedural for *Erie* purposes). Because this is a transfer-of-venue case, the Court follows *Stewart v. Ricoh*.

showed that Murin was given the employment agreement along with a number of documents after he was offered the job. He essentially signed the documents needed to start work and the employment agreement was one of them. Although he did not negotiate the agreement and it was generic, he was not told that the agreement was non-negotiable. All that can be said is that Murin made no attempt to negotiate terms with his new employer. He has not established any fraud or undue influence.

Murin has also failed to establish that enforcement of the clause would be unjust or unreasonable. Murin was aware, or should have been, when he signed the employment agreement that he was agreeing to litigate any disputes arising from the contract in Maine. While this was not a match-up between parties of equal experience, sophistication or bargaining strength, Murin, who holds a master's degree in biology, was not a babe-in-the-woods.

Although it will certainly be inconvenient and expensive for Murin and his witnesses to travel to Maine, Murin has not established that it would be so "gravely difficult and inconvenient" that he will be deprived of his day in court. *Bremen*, 407 U.S. at 15.  Finally, Murin has not demonstrated that any public policy would be offended by enforcement of the forum selection clause.[9]

---

[9]     Under Maine law, Murin's employment contract would likely be considered a contract of adhesion. *See Barrett v. McDonald Investments, Inc.*, 870 A.2d 146, 150-51 (Me. 2005); *see also State Farm Mut. Auto. Ins. Co. v. Koshy*, 995 A.2d 651, 668 (Me. 2010) (following New Hampshire law). Because of *Stewart v. Ricoh*, 487 U.S. at 32, the Court does not apply Maine law. But application of Maine law would not alter the result. Under Maine law, finding that a contract is an adhesion contract requires the Court to do two things: (1) construe any ambiguities in the contract against the drafter, and (2) void any unconscionable provisions in the contract. *See Barrett*, 870 A.2d at 150-51; *see also Koshy*, 995 A.2d at 668 (applying New Hampshire law); *Stenzell v. Dell, Inc.*, 870 A.2d 133, 144 (Me. 2005) (applying Texas Law.) Paragraph 14 is unambiguous in requiring litigation of claims interpreting or enforcing the contract to be brought in courts within the State of Maine. The Court does not consider paragraph 14's requirements to be unconscionable.

Murin's relative lack of bargaining power weighs in the balance, but it is not enough to overcome the strong presumption given to the plaintiff's choice of forum. Because OTV has a non-trivial presence within Maine, this is not a case in which the selected forum is alien to all parties or largely unconnected with the contractual relations at issue in the case. *See Kysar*, 983 F.2d at 1120 (discussing cases). Jeffrey Dumais, who investigated Murin's sexual harassment complaints, works out of OTV's Portland, Maine office. Where a company provides human resources services from within a particular jurisdiction, it makes sense that the company would adopt the law of that jurisdiction to govern its employment contracts and also that it would choose courts in the same jurisdiction to govern disputes arising under its employment contracts. Although the forum selection clause provides strategic advantages to OTV, there are legitimate reasons supporting Maine as the selected forum.[10]

The Court also rejects Murin's assertion that OTV's claims for interference with advantageous relationship, conversion, and defamation take this case outside of the contract's scope. "[C]ontract-related tort claims involving the same operative facts as a parallel claim for breach of contract should be heard in the forum selected by the contracting parties." *Kysar*, 983 F.2d at 1121-22. The remaining considerations are not enough to tip the balance in favor of transferring venue.

---

[10] "Employee acknowledges that RSN has employees located in various states, and that it is important to have consistent policies and laws apply to them insofar as matters relating to employment are concerned. Employee acknowledges that consistency in employment policy is beneficial because results will be predictable and all employees will be treated equally." Exhibit A to Verified Complaint at ¶ 14.

## CONCLUSION

For the foregoing reasons, OTV's motion for preliminary injunction is **DENIED**. Murin's motion for change of venue is **DENIED.**

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this  10th day of October, 2013.